IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROYAL FUND LP, a Colorado limited partnership, and STEPHENSON VENTURES, a Colorado limited partnership | Case No. 1:18-cv-11198 |
| Plaintiffs | **COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| DELOITTE & TOUCHE LLP, AND SIDLEY AUSTIN LLP | |
| Defendants. | |

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys.

## **INTRODUCTION**

1.     This lawsuit seeks to recover losses suffered by Plaintiffs from the purchase of notes from CarePayment Holdings, LLC, an affiliate of Aequitas Commercial Finance LLC. Aequitas and its affiliates operated as a fraudulent scheme selling over $600 million in "notes" and other securities to investors. Defendants' participation and assistance made these sales, including the sales to Plaintiffs, possible.  According to the most recent estimate by the court-appointed Receiver for the Aequitas companies, those investors will lose at least $450 million of the principal on their investments, after Aequitas collapsed in spectacular fashion and was shut down by the Securities and Exchange Commission ("SEC").

2.     The CarePayment securities were sold in violation of the Oregon Securities Law. The securities were not registered in compliance with Oregon law, and Aequitas sold the securities by means of untrue statements of material fact and omissions of material facts. A temporary litigation stay prevents plaintiffs from naming at this time as defendants in this lawsuit the Aequitas companies and others primarily liable for these violations, including Aequitas executives Robert Jesenik, Brian Oliver and Scott Gillis. However, the Oregon Securities Law provides for joint-and-several secondary liability in such situations. Defendants participated and aided in the unlawful sales of Aequitas securities. Thus, Defendants are jointly and severally liable to return to Plaintiffs the money they paid for the CarePayment notes, plus interest at the rate stated in the notes or 9 percent, whichever is greater.

3.     Aequitas represented that its securities were secure, stable, and liquid. Aequitas emphasized "strong asset coverage," and investors were told that the value of the Aequitas collateral backing their securities substantially exceeded the collective amount owed to security holders. Aequitas represented that it had taken additional steps to reduce risk, including securing guarantees and recourse agreements and monitoring the assets on a monthly basis. Investors were told that the money they invested would be used to purchase "stable" and valuable assets, primarily consisting of hospital and education receivables, from "financially strong institutions." Aequitas touted that its investors "have enjoyed consistent quarterly interest payments with no loss of principal since 2003." And they were told that their securities were liquid, meaning that investors could cash out of their

investments if they chose to do so. Each of those representations was untrue or misleading.

4.      In truth, there was nothing stable or secure about the investments. Aequitas was dependent upon investor money—not to fund purchases of assets, as Aequitas represented—but to satisfy redemptions and interest payments to other investors. Aequitas was also dependent

upon investors renewing their investments on maturity, to avoid huge redemption obligations. Aequitas' assets did not generate sufficient income to satisfy Aequitas' massive debt obligations, including to the investors. Investors were not told this. Instead, Aequitas manufactured an appearance of financial strength by manipulating the value of assets carried on its books. Aequitas accomplished this for six years by constructing a morass of interrelated companies and frequent inter-company transactions. The collateral values reflected on its books and in financial statements provided to investors, including Plaintiffs, were highly inflated. Aequitas failed to write down the collateral values even when the assets were severely distressed or worthless. Aequitas failed to disclose that a significant portion of investors' money was used to fund various Aequitas-related or -sponsored companies without receiving fair value.

5.      Aequitas internal documents reveal that Aequitas was dependent on receipt of new investor money at least as early as 2010. Aequitas internal communications detail a continuous cash crunch and dependence on raising huge amounts of new investor money and upon dissuading existing investors from redeeming their securities for survival. Rather than acknowledge its extensive

problems, Aequitas implemented a facade. To the outside world, Aequitas was flying high, throwing lavish parties, opening expensive new offices, hiring new employees, traveling by private plane—all of which compounded Aequitas' financial problems—and reporting impressive financial results. Inside the company, executives discussed in dire terms the company's continual failure to sell sufficient new securities to purchase assets and meet obligations. An October 2015 memo from one executive documents extensive, ongoing misuse of investor funds, misrepresentations in the sale of securities, failure to provide adequate disclosure information to investors, and routine violations of SEC rules and regulations. In February 2016, Aequitas was forced to disclose to investors for the first time that it had not been able to satisfy investors' redemption requests for months, leading to the implosion of Aequitas, the termination of nearly all of its employees, a lawsuit by the SEC, and a request to have a receiver appointed to manage the disaster.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interests and costs; and is between citizens of different states.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in New York and in this District.

8.      This Court has personal jurisdiction over Defendants pursuant to Rule 4(k)(1)(a) of the Federal Rules of Civil Procedure because Defendants are subject to the jurisdiction of the courts of general jurisdiction in New York.

## PARTIES

### Plaintiffs

9.      Plaintiff Royal Fund LP is a Colorado limited partnership with its principal place of business in Boulder City, Nevada.

10.      Plaintiff Stephenson Ventures is a Colorado limited partnership with its principal place of business in Boulder City, Nevada.

11.      Plaintiffs are managed by Emmet Stephenson, a resident of Boulder City, Nevada.

### Defendants

12.      Defendant Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership registered to do business in Oregon and New York. As detailed herein, Deloitte performed auditing and accounting services for Aequitas and enabled Aequitas to sell securities that are at issue in this action. Deloitte officially replaced EisnerAmper LLP as Aequitas' auditor on or about September 12, 2013. Deloitte prepared audited financial statements for Aequitas for the years 2013 and 2014. These audited financial statements were excerpted and referenced in offering documents and provided to prospective investors and existing investors, including Plaintiffs, deciding whether to invest or re-invest. The audited financial statements were a material part of the information made available to investors and the existence of an auditor gave Aequitas credibility. Indeed, the offering documents for Aequitas securities prominently identified Deloitte as Aequitas' auditor. On and after March 24, 2014, Deloitte was identified, in the publicly-

5

available Form ADV filed by Aequitas Investment Management, LLC ("AIM"), as the auditor for all the Aequitas funds (that is, all Aequitas fundraising vehicles other than ACF).

13.     Defendant Sidley Austin LLP ("Sidley") is an Illinois limited liability partnership. Sidley is an international business law firm that provided legal services to Aequitas in connection with the sale of securities that are at issue in this action. Sidley advised Aequitas with respect to the sale of its securities, including providing a critical legal opinion regarding Aequitas' compliance with the Investment Advisers Act of 1940 that enabled Aequitas to obtain clean audit opinions from Deloitte and to sell securities, and prepared legal papers necessary for Aequitas to complete the sale of its securities, including offering documents, risk disclosures, and subscription agreements. Sidley prepared these documents with knowledge that Aequitas would sell the subject securities. Sidley was identified as legal counsel to Aequitas in offering documents. The Aequitas securities could not have been sold without the legal services that Sidley provided.

## FACTUAL ALLEGATIONS

### I.     THE AEQUITAS ENTITIES

14.     Aequitas conducted its securities and other business activities through various affiliated entities. The complex organizational structure, consisting of approximately 75 active entities, aided Aequitas in hiding the true nature of Aequitas' business.

15.     Aequitas Management, LLC ("Aequitas Management") is the parent entity of the affiliated Aequitas entities. Aequitas Management owned 84 percent

of Aequitas Holdings, LLC ("Holdings"), which was the sole owner and member of Aequitas Commercial Finance, LLC, and the sole shareholder of Aequitas Capital Management, Inc.

16.     Aequitas Commercial Finance, LLC ("ACF"), a wholly owned subsidiary of Holdings, owns all or part of numerous Aequitas entities, including Aequitas Income Protection Fund, LLC ("AIPF"), Aequitas Income Opportunity Fund, LLC ("AIOF"), Aequitas Income Opportunity Fund II, LLC ("AIOF-II"), Aequitas Capital Opportunities Fund, LP ("ACOF"), Aequitas ETC Founders Fund, LLC ("AETC"), Aequitas Enhanced Income Fund, LLC ("AEIF"), and MotoLease Financial, LLC ("AMLF"). ACF also owned all of CarePayment Holdings LLC ("CPH").

17.     Aequitas Capital Management, Inc. ("ACM"), another wholly owned subsidiary of Holdings, is the manager of numerous Aequitas entities, including ACF and AMLF. As such, ACM oversees the operations and investment decisions of ACF and AMLF in exchange for certain management fees and other interests.

18.     ACM oversaw the operations and investment decisions of AIPF, AIOF, AIOF-II, AETC, AEIF, APCF, ACOF, and CPH (collectively, the "Aequitas Funds") in exchange for certain management fees and other interests. AIM, a wholly owned subsidiary of ACM and an SEC- registered investment advisor, is the manager of AIPF, AIOF, AIOF-II, AETC, AEIF, Aequitas Private Client Fund, LLC ("APCF"), and Aequitas Capital Opportunities GP, LLC, the general partner of ACOF ("ACOFGP"). The sole purpose of AIM was to act as the investment advisor to various Aequitas fundraising vehicles, including the Aequitas Funds.

7

## II.    THE AEQUITAS SECURITIES

19.    The Aequitas companies raised hundreds of millions of dollars from thousands of investors by selling securities issued by ACF, the Aequitas Funds, and AMLF.

20.    As detailed herein, none of the securities were registered under any state or federal securities law. The securities were not exempt from registration. The securities were not federal covered securities.

21.    The Aequitas companies raised investor funds by causing ACF to sell securities (the "ACF Notes") directly to investors through the so-called Aequitas "Private Note" program. The ACF Notes generally were referred to as "Secured Subordinated Promissory Notes" or "Secured Notes." The Private Note program was a continuous, unlimited offering. The offering had no ending date and no limit on the total investments. As of December 31, 2015, approximately $312 million in ACF Notes were outstanding to more than 1,500 investors.

22.    Aequitas raised additional investor funds by causing the sale of securities through other Aequitas entities, including the Aequitas Funds and AMLF. Aequitas generally referred to the securities sold through AIPF (the "AIPF Interests") as "Limited Liability Company Interests". Aequitas generally referred to the securities sold through AIOF (the "AIOF Notes") as "Senior Secured Promissory Notes". Aequitas generally referred to the securities sold through AIOF-II (the "AIOF-II Notes") as "Senior Secured Promissory Notes". Aequitas generally referred to the securities sold through AMLF (the "AMLF Notes") as "Senior Secured Promissory Notes". Aequitas generally referred to the securities sold through AEIF

8

(the "AEIF Interests") as "Limited Liability Company Interests". Aequitas generally referred to the securities sold through APCF (the "APCF Notes") as "Secured Promissory Notes". Aequitas generally referred to the securities sold through ACOF (the "ACOF Interests") as "Capital Commitments". Aequitas caused the sale of more than $300 million in securities through the Aequitas Funds and AMLF. Among the securities offered by Aequitas were "Subordinated Promissory Notes" issued by CPH (the "CPH Notes").

23.     The offerings of the Aequitas securities were a single integrated offering for purposes of the securities registration requirements under state and federal law. ACF owned all of the equity interests in AIOF, AIOF-II, AEIF, AMLF, and CPH, and all of the voting interests in AIPF, and ACF expressly guaranteed all of the notes sold by AMLF and CPH. Aequitas created ACOF for the purpose of swapping investor funds for ownership interests in certain Aequitas entities— Aequitas caused ACF and Holdings to contribute those ownership interests to ACOF at inflated values, and Aequitas then caused investor funds to be distributed out of ACOF to ACF and Holdings based on those inflated contributions. Many of the ACOF portfolio companies were entirely dependent on ongoing ACF financing, and many of the ACOF portfolio companies were dependent on ACF (through its subsidiaries) as their sole source of revenue. Aequitas created both AEIF and AIOF-II for the sole purpose of funneling investor funds to ACF and its affiliates, and that ultimately was the function of AIOF and AIPF as well—as of December 31, 2014, their only assets were approximately $33 million and $37 million, respectively, in loans to ACF and certain of its affiliates.

The integrated nature of these offerings was reflected in the audited financial statements of ACF, which were done on a consolidated basis and encompassed ACF, AIPF, AIOF, AIOF-II, AEIF, ACOF, AMLF, CPH, as well as numerous other Aequitas entities.

## III.   THE AEQUITAS SECURITIES WERE NOT REGISTERED, IN VIOLATION OF THE OREGON SECURITIES LAW

24.   The Aequitas securities, including the CPH Notes, were not registered under any state or federal securities law.

25.   The Oregon Securities Law required the registration of the CPH Notes and other Aequitas securities.

26.   Aequitas and persons acting on its behalf engaged in general solicitation and/or general advertising in connection with the offer and sale of the Aequitas securities.

a.   Aequitas and persons acting on its behalf routinely offered and sold securities, including the CPH Notes, to persons with whom the issuer did not have a substantial preexisting relationship.

b.   Aequitas and persons acting on its behalf engaged in roadshows promoting its securities to prospective investors and/or their investment advisors, including prospective investors and investment advisors with Aequitas did not have a substantial preexisting relationship.

c.   Aequitas and persons acting on its behalf widely disseminated promotional, marketing, offering, and sales materials relating to Aequitas securities to prospective investors and/or their investment advisors, including

prospective investors and investment advisors with whom Aequitas did not have a substantial preexisting relationship.

27.     The CPH Notes were not federal covered securities under the Oregon Securities Law. Nor were the CPH Notes covered securities under Section 18 of the Securities Act.

a.     The CPH Notes were not listed, authorized for listing, or sold on any national securities exchange, and the ACF Notes were not sold in the over-the-counter market.

b.     CPH did not file with the SEC any report, registration statement, or form (other than Form D).

c.     The CPH Notes were not exempt under Section 3(a) of the Securities Act, and offers and sales of the ACF Notes were not exempt under Section 4(a)(7) of the Securities Act or Rule 506 of Regulation D.

## IV.     THE AEQUITAS SECURITIES WERE SOLD BY MEANS OF UNTRUE STATEMENTS AND OMISSIONS

### A.     Facts Supporting Allegations of Specific Untrue and Misleading Statements

#### 1.     Undisclosed Prior Business Failures

68.     Prior to selling the securities at issue, the principals of Aequitas experienced numerous and substantial business failures. For example, Jesenik and Oliver faced securities fraud claims in 2004 relating to their management of the predecessor companies to ACM and ACF, wherein their former business partner alleged that he was told that the business was a "cash cow" when, in fact, it was losing six figures every month. Beginning in 2007, Aequitas made substantial

11

investments in a restaurant group that quickly failed. Also in 2007, Aequitas made substantial investments in Catcher Holdings, Inc., which failed almost immediately. In 2009, Aequitas was unable to satisfy an obligation to provide a $25 million credit facility to CashReady, LLC.

69.     Aequitas used another substantial business failure to create and artificially inflate the value of CarePayment Technologies, Inc. ("CPTI"). CPTI began life as microHelix, Inc., an SEC-registered company that made custom cable assemblies and mechanical assemblies for the medical and commercial OEM markets. In 2006, Aequitas began lending to and buying shares of microHelix. Aequitas had acquired more than 63% of the company's shares by 2007, when the company failed and ceased operations, officially becoming a registered "shell company" in September 2007. Aequitas ultimately sank about $20 million into its failed microHelix investment. At the end of 2009, Aequitas began the process of manipulating this $20 million failure into an illusory $35+ million asset.

## 2.     Use of Investor Funds and Inability to Purchase Receivables Assets

70.     Whereas investors were told that the proceeds would be used primarily to pursue specific investment strategies for a particular fund, investor funds were used instead to cover operating losses and obligations to investors across the Aequitas business.

71.     At all material times, Aequitas was unable to fund commitments to purchase receivables assets and unable to purchase assets because of insufficient capital.

72.     Aequitas compounded these problems by offering short-term

notes.

73.    In January 2010, Aequitas executives discussed internally their concerns about timely repayment of securities and the need to avoid "spook[ing]" investors with late payments. Furthermore, one investment advisor, Human Investing, notified Aequitas early in 2010 of its intention to redeem all of its customers' private notes, which were set to mature in 2010.

74.    In 2011, according to Aequitas internal communications, Aequitas needed to sell $20 million of securities per month, with $1 million from sources other than its primary fundraiser, Strategic Capital Group, to break even on cash flow.

75.    An internal Aequitas memorandum dated October 19, 2015, sent by an Aequitas executive to other Aequitas executives and in-house counsel, documents that only a small portion of investor proceeds were actually used to purchase assets, and that this practice extended widely to the entities within the Aequitas organization.

76.    The auditors identified Aequitas' dependence on sales of securities in their audit workpapers. In assessing Aequitas' ability to continue as a going concern as of December 31, 2012, EisnerAmper documented that Aequitas' heavy reliance upon selling securities raised doubts concerning Aequitas' ability to continue as a going concern. EisnerAmper noted that ACF had raised over $182.1 million in investor funds and that investors had renewed, rather than redeem, their investments at a historical rate of 60-70%, which led EisnerAmper to characterize the private note program as a permanent form of capital. EisnerAmper accepted,

uncritically, Aequitas' representations that it would take steps to lower the cost of this private capital. When Deloitte took over as auditor, it noted that ACF had raised over $182.1 million in investor funds and that investors had renewed, rather than redeem, their investments at a historical rate of 60- 70%, "making much of the capital a quasi-permanent form of capital." Remarkably, Deloitte cited "new investor money" as a basis for "the combined Aequitas companies" to operate as a going concern for the foreseeable future.

### 3.   Undisclosed Dependence on Renewals of Investments on Maturity

77.    Aequitas continually sold millions of dollars' worth of short-term securities. As a result, Aequitas continually faced the prospect of massive redemptions as the securities matured. Aequitas lacked capital or liquid assets sufficient to satisfy these obligations. Accordingly, Aequitas' survival was, at all relevant times, dependent upon convincing investors to renew their investments on maturity, rather than redeem, or cash out, the investments. Aequitas was very successful at this, with renewal rates as high as 70%. However, investors were not informed of the substantial risk that Aequitas would collapse if renewal rates faltered.

78.    The risk of non-renewal was exacerbated by the fact that Aequitas relied on a relative few investment advisors to steer their clients, and huge amounts of money, to Aequitas. Thus, Aequitas was at risk that one or more investment advisors would recommend that all of their clients redeem their investments and that Aequitas would be unable to repay those investors.

### 4.   Undisclosed Facts Concerning Asset Valuations

79.   At all relevant times, ACF overstated the reported values of its assets. Because the asset values were materially overstated, every representation by Aequitas that is based on or derived from those asset values was also materially overstated. For example, the purported "security" or "collateral" backing the Aequitas securities were overstated.

### a.   Notes Receivable (Loans to Affiliates)

80.   One of ACF's primary assets as reported in its audited financial statements was "Notes Receivable, Affiliates," which it also referred to as "Loans to Affiliates" in the Financial Information Summary sections of its various private placement memoranda.

81.   Aequitas Management, AIM and ACM were spending far more money than they were taking in, including large expenses related to the renovation of Aequitas' headquarters in Lake Oswego, opening a new office in New York City, outsized salaries for executives, expenses related to a private jet, and lavish expenses from marketing Aequitas securities to potential investors and brokers. Aequitas Management, AIM and ACM caused Holdings to "borrow" the shortfall from ACF. Money loaned by ACF to Holdings beginning no later than 2009 was, in turn, loaned by Holdings to AIM. The management fees that AIM generated from the various Aequitas funds were not sufficient to cover working capital needs. As a result, there was no reasonable prospect of repayment.

82.   Because ACF's financial statements did not include its parent, Holdings, or affiliate, AIM, these loans were improperly presented to ACF

investors as assets.

83.    Aequitas reported the loan from ACF to Holdings, which loan ultimately totaled $180 million, as an asset of ACF valued at the face-amount of the loan, despite the fact that Holdings had little or no chance of repaying the loan. At all relevant times, the amount due on the loan exceeded Holdings' assets.

84.    Generally Accepted Accounting Principles ("GAAP") required ACF to write down the carrying value of this note to reflect its impaired value. ASC 310 is the provision of GAAP that governs the recognition and valuation of loans. Pursuant to ASC 310-10-35, the impaired value of this loan should have been written down to the amount that ACF was likely to recover, based upon the likely future payments by Holdings, or, because Aequitas was unlikely to become profitable, the value of its assets that could be used to repay the note.

85.    At the end of 2010, Holdings owed ACF approximately $49 million and the assets of Holdings were only $46 million.

86.    By the end of 2011, Holdings owed ACF approximately $62.7 million.

87.    By the end of 2012, Holdings owed ACF approximately $80.6 million.

88.    By the end of 2013, Holdings owed ACF more than $78.8 million.

89.    ACF reported a value of $184.8 million in 2014. Of this total, $120.9 million was attributed to a note receivable from Holdings. Holdings lost $22.2 million in 2014. The limited assets of Holdings fell far short of the amounts borrowed from ACF and the company had no going concern value beyond its limited assets. By March 2014, Holdings' assets were $20 million *less* than the amount it

owed to ACF. The gap between the amounts that Holdings had borrowed and the amount it could repay based upon its assets continued to grow. By February 2015, Holdings had borrowed $127.6 million from ACF, but had only $67.0 million in assets. By June 2015, its assets had slipped to $65.3 million, while the balance it owed ACF climbed to

$169 million.

90.     By the end of 2014, the prospects for collection of the entire balance owed ACF by Holdings was, at best, in serious doubt, impairing the value of this note. As described above, there was at least a $20 million shortfall between the note balance and Holdings' assets by March of 2014, and that number had swelled to $60 million by February 2015. Accordingly, even accepting Aequitas' asset values, the value of the note receivable was overstated on ACF's audited 2014 financial statements by between $20 million and $60 million.

91.     This overstatement was highly material in light of ACF's reported equity of just $1.8 million. The accurate statement of the value of this note from Holdings would have alerted investors that ACF was insolvent and had a negative net asset value.

b.     **Corinthian Colleges Student Loan Receivables**

92.     On June 29, 2011, Aequitas caused ACF to enter into the Tuition Loan Program Agreement (the "TLPA") with Corinthian Colleges ("Corinthian") whereby ACF agreed to purchase private loans underwritten by an "originating bank" that bore no risk of loss, with Corinthian agreeing to immediately pay a 40-50% "discount fee" to ACF, resulting in a net purchase price of 50-60% of the face value

17

to ACF. Further, ACF retained the right to require Corinthian to repurchase any loans that were more than 90 days past-due (the "Recourse Loan Repurchases"). Accordingly, ACF would make the entire amount of this "discount fee" as profit if it collected on the loan (a 40% return), and Corinthian would buy back the loans on which ACF couldn't collect – a "no-lose" situation, as long as Corinthian honored its contractual agreement related to the Recourse Loan Repurchases.

93.     Between 2011 and February 2014, Campus Funding, LLC (a wholly-owned subsidiary of ACF) bought $561 million in face value of student loan debt from Corinthian Colleges.

94.     However, widespread criticism of Corinthian's business practices continued following ACF's entry into the TLPA with Corinthian. By June of 2013, Corinthian had admitted that it was being investigated by the SEC related to its business practices, including its student loan default rates. Other governmental regulators were investigating Corinthian as well. By late 2013, the writing was on the wall that federal regulators were going to stop Corinthian's ability to obtain federal student loan financing for its students, which would be the death-knell of the company. Corinthian had honored its recourse obligations through May of 2014, but on June 18, 2014, ACF sent a Notice of Default to Corinthian Colleges, complaining that Corinthian had failed to honor its recourse obligations, and Corinthian would never again make any recourse payments to ACF.

95.     In its 2012 financial statements, ACF reported net assets (member's equity) of just $1.3 million, including $120 million of student loan receivables carried at ACF's determination of the "fair value" of such assets.

18

EisnerAmper provided an unqualified audit opinion based on these numbers.

96.    However, ACF's audited 2012 financial statements overstated the reported fair value of its student loan receivables, as would later be admitted in its 2013-2014 financial statements:

> Subsequent to the issuance of the Company's consolidated financial statements for the year ended December 31, 2012, the Company determined that it had incorrectly calculated the fair value of its student loan receivables for the year then ended and incorrectly deferred and amortized commissions paid on its student loan receivables. Consequently, the Company has retroactively corrected its student loan receivables and deferred charges as of January 1, 2013. As a result, its members' equity has been restated as of January 1, 2013. The cumulative effect of these corrections on the Company's members' equity was a decrease of $3,071,099.

97.    This overstatement was plainly material in that the accurate reporting of these amounts in its 2012 financial statements would have lowered ACF's Members' equity to a negative number, rendering it insolvent. Had investors been aware of ACF's insolvency, they would likely not have been willing to purchase its notes.

98.    ACF again overstated the value of its student loan receivables in its 2014 audited financial statements. A significant portion of the $552.7 million of total reported assets of ACF on December 31, 2014 was the total of $105.6 million in receivables ($31.8 million carried at cost and $74.8 million carried at purported "fair value"). The value of both the receivables carried "at cost" and those carried at "fair value" were materially misstated in ACF's 2014 financial statements.

99.    ACF carried Corinthian loans that had defaulted (for which payment was more than 90 days late) at their $31.8 million cost of acquisition by ACF.

Because ACF paid a net cost of 50-60% of face value, these loans were, at the most, approximately $64 million in face value. On August 20, 2014, Corinthian sold virtually all of the similar defaulted student loans it owned, totaling approximately 170,000 loans with a face value of $505 million to a third party for $19 million, or approximately 3.7% of face value. Accordingly, the impaired value of these defaulted assets was no more than $2.4 million, but ACF recognized it on its financial statements at the acquisition cost of $31.8 million – an overstatement of $29.4 million.

100.    Likewise, ACF valued the non-defaulted Corinthian Loan receivables at their purported "fair value" of $74.8 million based on a discounted cash flow technique described in the footnotes to its 2014 financial statements that was based on numerous factors including: (i) a weighted average interest rate of 5.9% to 14.9%; (ii) a weighted average term of 48-164 months; (iii) SSR rate of 0.0% to 18.6%; and (iv) a recourse rate of 39.0% to 69.0%. This "recourse rate" was a key variable in performing the calculation because all recourse payments paid the loan amount in full on a loan that would otherwise have had zero value.

101.    But the "recourse rate" of between 39% and 69% used in ACF's model was improper, and had no basis and caused these calculations to be overstated.

102.    On July 1, 2014, the General Counsel of Aequitas sent a letter to one of its former business partners, admitting that Aequitas was aware that Corinthian would no longer honor its commitment to repurchase defaulted loans from ACM:

**[W]e believe that Corinthian does not intend to make any payments to Campus Student Funding under the TLPA**

**and related agreements** . . .

\* \* \*

To the extent Corinthian is unable to continue as a going concern and/or is unwilling to honor its obligations under the TLPA and related agreements, **the Corinthian loan portfolios funded by Campus Student Funding will effectively become non-recourse**.

103.    This letter further admitted that the adverse publicity and regulatory actions against Corinthian was likely to further degrade the portfolio's value beyond previous years' performance statistics:

In addition, it is also possible that the operating agreement between Corinthian and the <u>Department of Education</u> **may cause additional harm to our existing <u>student loan portfolios</u>**. Further, the risk of borrowers changing their payment behavior once the news about the Corinthian school wind-down has gained greater public attention represents **another significant challenge to <u>the future performance of the student loan program</u>**.

104.    The letter concluded by admitting that the combination of these factors was likely to have a serious adverse impact on the Corinthian portfolio:

As a result of Corinthian's defaults and possible deterioration of the student borrower's payment performance, **we anticipate lower collections and <u>significant additional expenses for servicing the existing portfolios that</u> <u>will not be reimbursed</u>** as well as foregone revenues from default aversion fees, marketing participation fees, and ancillary fees that will not be paid. (emphasis added).

105.    Thus, by at least July 1, 2014, ACM and ACF were admittedly aware that: (i) Corinthian would no longer make any Recourse Loan Purchases, changing the character of the portfolio into a non-recourse portfolio; ii) the Corinthian Loan portfolio had been further harmed by Corinthian's agreement with the Department of Education to disband its schools; and (iii) Aequitas expected "Lower collections and significant additional expenses" related to this portfolio. Accordingly, the use of

21

a "recourse rate" of 39% to 69% had no basis and served to dramatically overstate the calculation of fair value.

106.    As admitted by Aequitas' General Counsel, these loan portfolios had "effectively become non-recourse portfolios." Accordingly, their proper valuation should have been consistent with the August 20, 2014 sale of non-recourse loans for 3.7% of face value. This improper valuation methodology violated GAAP, and specifically ASC 825 by failing to recognize the Corinthian Loan assets at their dramatically decreased fair value.[1]

107.    ACF's 2014 audited financial statements failed to disclose the significant contingency that the CFPB had filed a lawsuit seeking a judicial rescission of all of the Corinthian Loans carried as assets on ACF's balance sheet. At a minimum, footnote disclosure of this contingency was required by GAAP. Specifically, ASC 450 requires disclosure of material loss contingencies that are "reasonably possible" (as was the CFPB's requested relief) to occur.

c.    **CarePayment Healthcare Receivables**

108.    Aequitas purchase healthcare receivables through Carepayment, LLC ("CPLLC"), a wholly-owned  subsidiary of CPH, and its affiliates. Aequitas pledged all of its health care receivables as collateral to secure loans to Aequitas from third party lenders.

109.    Aequitas created an illusory asset in CPTI by causing it to service the Aequitas healthcare receivables owned by CPLLC. But CPTI, which had no employees or facilities of its own, had no genuine independent value—it simply turned around and paid Aequitas to perform all of its servicing operations and

functions.

110.    The claimed value of CPTI was dependent on the health care receivables owned by Aequitas and on continuing financing from Aequitas.

### d.    Freedom Financial Consumer Credit Receivables

111.    The consumer credit receivables purchased by Aequitas (through ACF and other Aequitas affiliates) were largely subprime "C+" and "F+" consumer credit receivables (the "Freedom Financial Receivables").

112.    The C+ Freedom Financial Receivables comprised debt consolidation loans to persons who were insolvent or otherwise unable to meet their existing financial obligations.

113.    Aequitas was exposed to the entire credit risk associated with the Freedom Financial Receivables, and it had no recourse to any third party with respect to any default or nonperformance under the Freedom Financial Receivables.

114.    Aequitas was leveraging investor funds to secure substantial additional third-party financing for its purchase of the Freedom Financial Receivables.

115.    Aequitas did not disclose the nature, extent, or material terms of the third-party financing underlying its purchase of the Freedom Financial Receivables.

116.    Aequitas had pledged the Freedom Financial Receivables as collateral to secure all or substantially all of the third-party financing underlying Aequitas' acquisition of the Freedom Financial Receivables.

117.   ACF had guaranteed the repayment of the third-party financing underlying Aequitas' acquisition of the Freedom Financial Receivables under certain circumstances.

118.   The failure rate for the Freedom Financial Receivables was materially worse than the failure rate assumptions on which the third-party financing was based.

119.   The failure rate for the Freedom Financial Receivables was materially worse than the failure rate necessary for the viability of the Freedom Financial Receivables line of business.

120.   At least as early as mid-2015, the failure rate of the Freedom Financial Receivables caused Aequitas to be in default on the third-party financing underlying its purchase of the Freedom Financial Receivables.

121.   The claimed value of Aequitas' wholly-owned subsidiary ACC Holdings 1, LLC ("ACCH-1") and its affiliate ACC Holdings 2, LLC ("ACCH-2"), depended entirely on the performance of the Freedom Financial Receivables.

122.   The value of ACF's ownership interest in ACCH-1 depended entirely on the performance of the Freedom Financial Receivables owned by ACF through ACCH-1's wholly- owned subsidiary ACC Funding Trust 2014-1 ("ACCTrust-1").

123.   The value of ACF's loans to ACCH-2 depended entirely on the performance of the Freedom Financial Receivables owned by Aequitas through ACCH-2's wholly-owned subsidiary ACC Funding Trust 2014-2 ("ACCTrust-2").

124.   Aequitas claimed as valuable assets (i) ACF's ownership interest in ACCH-1, and (ii) the Freedom Financial Receivables owned by ACF (through

ACCTrust-1), in addition to (iii) the amounts outstanding on ACF's direct loans to ACCH-2.

125.   The claimed collateral supporting the Aequitas securities included (i) ACF's ownership interest in ACCH-1, and (ii) the Freedom Financial Receivables owned by ACF (through ACCTrust-1), in addition to (iii) the amounts outstanding on ACF's direct loans to ACCH-2.

### e.   MotoLease Motorcycle Leases

126.   The claimed value of Aequitas' MotoLease, LLC, affiliate ("MotoLease") was based largely on its ability to continue to sell vehicle leases to ACF (through its wholly-owned subsidiary AMLF).

127.   The claimed value of AMLF was based entirely on the value of the vehicle leases purchased from MotoLease.

128.   Aequitas was exposed to the entire credit risk associated with the MotoLease vehicle leases, and no recourse to any third party with respect to any default or nonperformance under any of those leases.

129.   ACF claimed as valuable assets both (i) ACF's direct and indirect (through ACOF) ownership interest in MotoLease, and (ii) the vehicle leases owned by ACF (through AMLF and its affiliates).

130.   Aequitas claimed as collateral supporting the Aequitas securities included both (i) ACF's direct and indirect (through ACOF) ownership interest in MotoLease, and (ii) the vehicle leases owned by ACF (through AMLF and its affiliates).

131.   Aequitas had pledged MotoLease vehicle leases as collateral to

secure loans to Aequitas from third party lenders.

### f.   ETC Broker-Dealer

132.   The claimed value of Aequitas' ETC Global Group, LLC affiliate ("ETCGlobal") was based entirely on the continuing operations and performance of its indirect subsidiary Electronic Transaction Clearing, Inc. ("ETC"), a registered broker-dealer, in compliance with applicable laws and regulations. Aequitas did not disclose the administrative, regulatory, and legal difficulties that were undermining and diminishing the viability of ETC's continuing operations and performance, including, for example:

a.   Aequitas did not disclose (i) that during the period from 2009 to 2015, ETC was operating in violation of exchange rules, NASD Rule 3010, FINRA Rule 2010, and Section 15(c)(3) of the Securities Exchange Act of 1934 and Rule 15c3-5 thereunder by failing to establish and maintain an adequate system of risk management controls and supervisory procedures, and by failing to prevent its market access customers and their traders from executing thousands of potentially manipulative trades on the exchanges of which ETC was a member despite numerous red flags and repeated notice from regulators, (ii) the regulatory investigation concerning those violations, or (iii) the FINRA complaint filed against ETC with respect to those violations.

b.   Aequitas did not disclose (i) that at least as early as 2012, ETC was operating in violation of the Bank Secrecy Act, 31 U.S.C. 5311 *et seq.* and the regulations promulgated thereunder by failing to establish and implement adequate anti-money-laundering ("AML") policies, procedures, and controls, or (ii)

the regulatory investigation concerning those violations.

c.     Aequitas did not disclose (i) that over a two-year period, ETC had misreported transactions to FINRA and the SEC in a manner that excluded critical information regarding suspicious transactions, or (ii) the regulatory investigation concerning those violations.

d.     Aequitas did not disclose (i) that in October 2012 and again in April 2013, ETC was censured and fined for violations of FINRA Rule 7450(a), or (ii) that ETC had been operating in violation of that rule.

e.     Aequitas did not disclose (i) that in December 2013, ETC was censured and fined for violations of EDGA Exchange rules, or (ii) that ETC had been operating in violation of those rules.

f.     Aequitas did not disclose (i) that in January 2014, ETC was censured and fined for violations of SEC Rule 200(g) of Regulation SHO and NASDAQ Rules 2110, 3010, and 4755, or (ii) that ETC had been operating in violation of those rules.

g.     Aequitas did not disclose (i) that in February 2014, ETC was censured and fined for violations of SEC Rule 17a-3, FINRA Rules 2010 and 7450, and NASD Rules 3010 and 3110, or (ii) that ETC had been operating in violation of those rules.

h.     Aequitas did not disclose (i) that in April 2014, ETC was censured and fined for violations of EDGX Exchange rules, or (ii) that ETC had been operating in violation of those rules.

g.     **Strategic Capital**

133.    Aequitas did not disclose regulatory and legal issues related to ACF's indirect subsidiary, Strategic Capital Alternatives, LLC, and its affiliates, including Strategic Capital Group, LLC. Aequitas did not disclose that the claimed value of its SCA Holdings, LLC, affiliate ("SCAH"), depended in part on the successful funneling of investor funds to Aequitas by the direct and indirect subsidiaries of SCAH, including the registered investment advisors Strategic Capital Alternatives, LLC; SAS Capital Management LLC; and Argentus Advisors, LLC. Aequitas did not disclose that the value of ACF's loans to SCAH depended in part on the successful funneling of investor funds to Aequitas by the direct and indirect subsidiaries of SCAH. Aequitas did not disclose that ACF claimed as valuable assets both (i) ACF's ownership interest (through ACOF) in SCAH, and (ii) the amounts outstanding on ACF's direct loans to SCAH.

### g.    <u>Separation of Servicing Businesses from Receivables</u>

134.    The most significant vehicles used by Aequitas to create and inflate asset value were CPTI and EDPlus Holdings, LLC ("EDPlus"), both of which were ACOF portfolio companies. Aequitas overstated the values of CPTI and EDPlus by separating the underlying assets (receivables) from the business of servicing those receivables. CPTI and EDPlus were servicing companies; they did not own the receivables, only the right to service the receivables (which right could be terminated). By contrast, Aequitas used the receivables as collateral for institutional lines of credit (for example, from Bank of America and Wells Fargo) that Aequitas used to fund all Aequitas operations. By doing so, Aequitas

leveraged investor funds, putting itself in a deeper hole.

**B.**     **False and Misleading Statements Regarding Aequitas Securities**

135.     Aequitas sold Aequitas securities by, among other things, means of PPMs issued in 2007, June 2010, December 2011, November 2012, November 2013, September 2015, and in various supplements.  In those PPMs, Aequitas told investors that it "specializ[es] in private credit and equity market strategies within the healthcare, education and financial services industries".

136.     In the PPMs, Aequitas told investors that it was highly experienced, highly expert, and able to manage and minimize risk:

   a.   That it "has structured, invested, syndicated and advised on more than $2.5 billion of customized transactions."

   b.   That Aequitas "leverages technology, a lending subsidiary, and an elite partner network with a focus on undervalued niche strategies and capital protection."

   c.   That it was able to "generate[] returns by providing sophisticated financing solutions to firms currently underserved by commercial banks and other large financial institutions," and that Aequitas obtained "[c]ompetitive advantages" "from the combination of extensive professional relationships, early visibility of transaction opportunities, an in-depth understanding of client companies, and the ability to offer a full suite of financial products."

   d.   That its "unique combination of lending, fund management and distribution gives it priority position as a long term, ongoing capital partner for various servicing/strategy partners.

   e.   That it had "[h]ighly disciplined processes and underwriting standards," "[h]igh quality choices from an extensive deal flow," and "[i]nnovative strategies that provide favorable financial returns,"

   f.   That it would use "diversification... to mitigate the impact of a single challenged credit on the overall portfolio performance," and "appropriate underwriting and on-going monitoring to decrease the likelihood of a client default."

   g.   That Aequitas "will invest in non-market correlated, niche income-yielding strategies that emerge from inefficient market conditions and which are underserved by traditional lenders," and that "[b]y remaining fast-moving and

flexible, the Company will be able to capitalize on a variety of conditions contributing to favorable deal structure and pricing."

h.  That Aequitas "had a team of industry experts and years of experience in [receivables] markets," such that it was "well-positioned to take advantage of these currently favorable market conditions."

137.   Aequitas made similar statements on its website: "Aequitas Capital is an investment management firm that builds and distributes alternative investment solutions for clients. Aequitas has grown to nearly $300 million in assets under management and $1.86 billion in transactions to date, by pursuing strategies that emphasize capital protection and low market correlation."

138.   Aequitas told investors that it was able to take advantage of special opportunities.  In particular, Aequitas told investors it would "provide capital to its subsidiaries which in turn fund or purchase" "portfolios of healthcare receivables at a substantial discount from their face amounts" through a subsidiary company known as CarePayment, LLC; and, beginning in December 2011, it would provide capital to purchase student loans.

139.   Aequitas created the expectation for investors that because of its experience and expertise and the special opportunities, Aequitas was able to earn above-market returns —returns above those "commensurate with returns on investments in other enterprises having corresponding risks." Aequitas told investors that it was able "to enhance return and reduce risk," that it "has generated premium yields with a focus on value investments."

140.   Aequitas knew that its track record was a material consideration to investors. It touted its "20 years in business" and growth in assets under management from 1993 to present of $500 million. But those statements are

materially misleading when in fact, Aequitas had a mediocre" track record with respect to all of its investments.

141.    Taken together, the statements by Aequitas in its PPMs communicated and would be understood by a reasonable investor to mean that Aequitas was highly experienced, highly expert, able to locate and invest in special opportunities, able to minimize risk, and able to earn above market returns; that Aequitas had a track record of being able to keep and perform its obligations; that investments in Aequitas could be reasonably expected to earn relatively higher returns while, at the same time, exposing the investor to relatively lower risk; that investments in Aequitas were safe and secure; that Aequitas was solvent; that a purchaser was taking upon him or herself nothing more than the ordinary risks incident to a business making a series of well-secured loans to a diversified portfolio of borrowers. The statements created false expectations and the illusion of prosperity.

### C.    <u>Aequitas Ability to Continue as a Going Concern</u>

142.    By December 31, 2011, ACF's auditor, defendant EisnerAmper, was beginning to have "substantial doubts" about ACF's "ability to continue as a going concern"—none of which were ever disclosed to investors. Eisner had the benefit of the work papers of ACF's previous auditor, AKT, which documented significant "going concern" challenges. In a memo from April 2009, AKT flagged ACF's ability to continue as a going concern because "[t]he Company has recurring operating losses, negative operating cash flows and needs significant new sources of operating capital. The Company has approximately $40M of promissory notes

31

which have 1-2 year maturities eligible for redemption. If there are significant redemptions, the Company may be unable to obtain the capital to satisfy possible redemptions."

143. In June of 2012, EisnerAmper concluded in a memorandum that there is a "substantial doubt about ACF's ability to continue as a going concern." EisnerAmper raised four concerns: (i) ACF had a net operating loss in 2010, (ii) ACF's net income for 2010 was entirely attributed to an $8.3 million paper gain based on an accounting option to value the student loan portfolio without any discount for the substantial risk of default; (iii) ACF was owed $78 million from its parent, members of management, and affiliated entities and (iv) ACF was heavily reliant on new investments to fund operations. (Meanwhile, Aequitas had disclosed to investors that funds could be used to "to provide lines of credit for investment funds managed by affiliates of the Company and other general corporate purposes," but nothing in any PPMs disclosed anything about using investor money to make advances to "members of management."

144. As it had in June 2012, in April 2013, EisnerAmper again found "conditions or events that raise substantial doubt about ACF's ability to continue as a going concern," and again "evaluated management's plans for mitigating" those conditions or events. This time, EisnerAmper noted ACF's "Diverse and Growing Capital Base," and ACF's now "Long-Term Profitability."

145. Because EisnerAmper's notes failed to disclose that ACF could not continue as a going concern but for additional new investments (i.e, the definition of a Ponzi-scheme), Aequitas could tout the financial statements EisnerAmper

audited even after it was no longer auditing Aequitas.

146.   Deloitte officially replaced EisnerAmper as Aequitas's auditor in or around October 2013 (Deloitte had begun performing non-audit work for Aequitas earlier in 2013).   Although ACF's financial condition had not improved, Deloitte apparently raised no doubts about ACF's ability to continue as a going concern, and Aequitas disclosed no such doubts to investors. Indeed, in March 2015, Deloitte apparently agreed with Aequitas that ACF need not prepare any "going concern" letter for an affiliated fund, IPF, which was operating illegally in violation of the Investment Company Act of 1940 and was unable to repay its investors.

## D.   <u>Aequitas Violations of the Investment Company Act</u>

147.   The Investment Company Act generally applies to any "investment company," which generally is any "issuer" that is primarily engaged in "the business of investing, reinvesting, or trading in securities." 15 U.S.C. § 80a-3(a)(1)(A). Under the Investment Company Act, investment companies are required to register with the SEC unless an exemption applies. In addition to registering with the SEC, investment companies that are not exempt from the Investment Company Act must (a) make regular disclosures relating to the financial condition and investment policies of the investment company, (b) comply with other substantive requirements and restrictions designed to increase transparency avoid conflicts of interest, including (i) board independence requirements, (ii) limits on borrowing money and raising capital, and (iii) restrictions on the types and amounts of securities that can be acquired by investment companies.

148.    Aequitas desperately wanted to avoid registration with the Investment Company Act, particularly for its primary fundraising engine, ACF. Aequitas told investors in 2009 through 2011 that ACF "will not register itself as an investment company under the U.S. Investment Company Act of 1940. Instead, the Company will rely on exemptions from these laws ...." This statement created the illusion that Aequitas had determined it qualified for the exemptions, which was not true.

149.    In 2014, ACF was out of compliance with the Investment Company Act and remained out of compliance through 2015. Yet, in a supplemental PPM ACF issued in October of 2014, Aequitas continued to represent that it was not registering as an Investment Company "in reliance upon certain exemptions from registration . .." That was not true because Aequitas knew that it was not in compliance with the Investment Company Act and no exemptions from registration were available.  That Aequitas failed to disclose that it was not in compliance with the Investment Company Act was materially misleading and every security sale it made while out of compliance was illegal.

150.    In the words of Aequitas's general counsel, Aequitas was in the midst of a "mad-dash restructuring" during the summer of 2015 in an effort to evade registration under the Investment Company Act. That, in turn, involved numerous sham transactions to move bad assets out of ACF and into other funds for little or no consideration to ACF. The restructuring efforts included a new fund, the Private Client Fund, that was specifically set up to buy a portion of ACF's bad assets in an unsuccessful attempt to bring it into compliance with the Investment Company

Act. The Private Client Fund made no mention of the real reason for the fund or that it would be buying assets of ACF. Instead, the PPM represented that the "Fund intends to make opportunistic investments in non-market correlated, niche income-yielding strategies that exist in inefficient markets that are underserved by traditional lenders." That, of course, was not true.

###### E.   **Aequitas COF Offering**

151.   In April 2013, Aequitas purported to address concerns about its viability by developing a plan to reduce its cost of capital by shifting investors from private notes (ACF and IOF) to other equity funds. It also planned to reduce Holdings' debt to ACF, stating that "Holdings should be in the position to pay down its loan with ACF by at least $15 million in 2013" because ACF and Holdings are "likely" to have "liquidation events" in 2013, particularly in relation to two investment subsidiaries, ETC Holdings and CarePayments Technologies, Inc.

152.   Aequitas was able to follow through with this schemes with the aid of defendants Sidley and Deloitte, through a new offering of securities in ACOF, which opened in February 2014. Creating ACOF—initially referred to as "Merchant Bank Fund" and then "Special Opportunities Fund"—took months of legal and accounting gymnastics that were, at least in part, designed to evade Investment Company Act compliance and going concern issues.

153.   Assisted by Sidley and Deloitte, Aequitas created ACOF caused ACF and Holdings to contribute those ownership interests in Aequitas entities to ACOF at inflated values, and Aequitas then caused investor funds to be

distributed out of ACOF to ACF and Holdings based on those inflated contributions.

154.    The creation of ACOF and the offering of its securities created the appearance that Aequitas, and ACF in particular, was able to keep and perform its obligations and that investments in Aequitas entities could be reasonably expected to earn relatively higher returns while, at the same time, exposing the investor to relatively low risk.

155.    Without the ACOF offering, Aequitas's sales of other securities by means of the  untrue statements and misleading omissions described herein would have been difficult or impossible to continue; the sales would have been seriously impeded. Aequitas could not have mislead purchasers that Aequitas had a track record of being able to keep and perform its obligations, that investments in Aequitas were safe and secure, that Aequitas was solvent, and that a purchaser was taking upon him or herself nothing more than the ordinary risks incident to a business making a series of well-secured loans to a diversified portfolio of borrowers.

156.    Deloitte was instrumental in helping Aequitas structure COF to avoid Investment Company Act problems and avoid consolidating the financials of Holdings and ACF. Indeed, an email from Aequitas executives noted that "Deloitte will be focused on ensuring that the Special Opportunity Fund (later named ACOF) is not just being created to move certain parts of our business off-balance sheet. Hence, the more non-affiliated investments, i.e. investments where Aequitas owns less than 50% and/or does not insert operational control, are in the

fund, the better to address the aforementioned concern." This is just one example of the special role Deloitte had in trying to "dress up" ACOF as a legitimate investment.

## V.     PLAINTIFFS PURCHASES OF CPH NOTES

157.    From July 2015 to November 2015, Plaintiffs, represented by Emmet Stephenson, had five or six conversations with Aequitas representatives regarding investing in Aequitas securities, including CPH Notes. Emmet Stephenson's conversations were with James Alexander.

158.    On or about August 18, 2015, Emmet Stephenson had a meeting with Brian Oliver, Executive Vice President of Aequitas, and Rory Donnelly, Vice President of Aequitas, in Boulder City, Nevada.

159.    At this meeting, Oliver provided Emmet Stephenson with information regarding the CPH Notes and other Aequitas securities including a copy of ACF's audited financial statements for 2014 and unaudited financial statements for CPH for the six months ended June 30, 2015.

160.    During his conversations with Emmet Stephenson, Oliver misrepresented the financial condition of Aequitas and its history and created the impression that investments in Aequitas securities were safe and secure, that Aequitas was solvent, and Plaintiffs were taking on just ordinary risk incident to a business making a series of well-secured loans to a diversified portfolio of borrowers. Oliver advised Emmet Stephenson that the Aequitas securities Plaintiffs were interested in purchasing were ring-fenced from any exposure to Corinthian and any issues with Corinthian would not affect the specific Aequitas

securities, in particular the CPH Notes, that Plaintiffs would purchase. Oliver
and Alexander emphasized Aequitas's track record, its "20 years in business" and
the growth in assets under management from 1993 to 2015.

161.    During his conversations with Oliver, Emmet Stephenson advised
that Plaintiffs were willing to purchase CPH Notes starting in October 2015 and
that Plaintiffs would continue to buy CPH Notes as they became available.

162.    On or around October 15, 2015, Plaintiff Stephenson Ventures
purchased a CPH Note in the amount of $1,000,000.

163.    On or around October 15, 2015, Plaintiff Royal Fund L.P. purchased
a CPH Note in the amount of $1,000,000.

164.    On or around November 30, 2015, Plaintiff Stephenson Ventures
purchased a CPH Note in the amount of $1,500,000.

165.    Plaintiffs also purchased other Aequitas securities on or about
October 15, 2015.

## VI.    THE COLLAPSE OF AEQUITAS AND PLAINTIFFS' DISCOVERY OF THE BASIS FOR THEIR CLAIMS

166.    The truth of the untrue and misleading statements alleged
herein was not disclosed to Plaintiffs.

167.    On February 8, 2016, ACM disclosed that it had retained FTI
Consulting (a forensic and investigative financial consulting firm) to take over
management control of the portfolio and to advise on financial matters and
potential restructuring of the Aequitas entities.

168.    On February 16, 2016, Aequitas told Oregon state officials that it
intended to lay off 80 employees, and told each of these employees that the "layoff

is intended to be permanent in nature."

169.    On March 10, 2016, the U.S. Securities and Exchange Commission filed suit in this District against Aequitas, Jesenik, and Oliver charging them with securities fraud in connection with their sales of securities.

170.    Soon thereafter, the SEC and the Aequitas entity defendants asked the Court to appoint Ronald Greenspan of FTI as receiver for the Aequitas entities.

## VII.    DEFENDANTS PARTICIPATED AND MATERIALLY AIDED IN THE SALE OF AEQUITAS SECURITIES

171.    Deloitte participated and materially aided in the sales of securities by Aequitas beginning no later than September 13, 2013.

a.    Deloitte acted as the auditor for numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF; AETC; AEIF; Aequitas Carepayment Fund, LLC; Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC. Deloitte audited the consolidated financial statements of ACF, which encompassed ACF as well as the following Aequitas entities: CPH; CP Funding I, LLC; CA Medical, LLC; Campus Student Funding, LLC; Destination Capital Equipment Finance, LLC; The Hill Land Company, LLC; EC Hangar, LLC; Aequitas North American Finance, Inc.; Aequitas Equipment Finance, LLC; CP Leverage I, LLC; CSF Leverage I, LLC; Aequitas CarePayment Fund, LLC; Aequitas Income Fund, LLC; AIOF; AIOF-II; AIPF; AEIF; ACOF; and AMLF.

b.    Deloitte's auditing services enabled the Aequitas group to conduct its securities business as a whole. Deloitte's willingness to audit Aequitas only below the level of Holdings gave Aequitas the freedom it needed to undertake

the transfers and transactions with the entities outside the Deloitte-audited fundraising group that allowed it to create and perpetuate the illusion of financial health. Aequitas needed the stamp of legitimacy provided by a "clean" audit opinion from an established and reputable audit firm in order to attract, secure, and retain investors and their funds. And Aequitas needed the audited annual reports in order to comply with an exception to the standard custody requirements of the Investment Company Act, an exception that allowed Aequitas to continue to raise and use investor funds free of outside scrutiny.

c.      Aequitas informed Deloitte that it wished to transition auditing services from EisnerAmper to Deloitte because of Aequitas' desire to have a more prominent audit firm with a national reputation. In addition, Aequitas informed Deloitte that Aequitas was not satisfied with EisnerAmper's industry qualifications, and Deloitte was selected for its qualifications relating to Aequitas' industry. Having Deloitte as the auditor of its securities business gave Aequitas clout with prospective and existing investors, and the Deloitte-audited financial statements were a material part of the information made available to prospective and existing investors. Deloitte replaced EisnerAmper as Aequitas' auditor no later than September 12, 2013.

d.      Aequitas provided the financial statements audited by Deloitte to prospective and existing investors who were deciding whether to invest or re-invest in Aequitas securities, including Plaintiffs. Deloitte was aware that Aequitas was subject to this requirement and that the audited financial statements would be used in this way and for this purpose.

e.     Deloitte's working papers acknowledge that SEC rules required the distribution of audited financials and that the audited financials would be used by potential and current investors.

f.     Aequitas identified Deloitte as the auditor in the PPMs for various Aequitas securities, as alleged herein. Aequitas also identified Deloitte as the auditor for the Aequitas Funds in public disclosures filed with the SEC. Deloitte is identified as auditor in the Form ADVs (Part 1A) filed by AIM with the SEC dated March 24, 2014; May 27, 2014; and March 31, 2015.

g.     Aequitas could not have continued to sell securities without Deloitte's annual audits, nor could Aequitas have continued to sell securities without distributing the annual Deloitte-audited financial statements to investors.

h.     Deloitte was identified as auditor in marketing materials for Aequitas securities, and Deloitte approved Aequitas forwarding its contact details to potential investors conducting due diligence.

172.   Sidley participated and materially aided in the sales of securities beginning no later than April 5, 2013.

a.     Sidley's initial engagement letter dated March 1, 2012, identifies ACF as Sidley's general client in all matters. Sidley provided legal services to ACF and other Aequitas entities in connection with the sale of its securities.

b.     Sidley prepared legal papers necessary for Aequitas to complete the sale of its securities.

c.     Sidley prepared offering documents required for Aequitas to

complete the sale of its securities, including ACOF securities. As reflected on invoices, Sidley billed Aequitas more than $350,000 for its services relating to the ACOF securities offering, including the following services: Drafting PPMs and at least three supplements thereto, drafting subscription documents, drafting the administration agreement, drafting marketing materials, drafting the term sheet, revising the pitch book, drafting the fact sheet, and drafting the fund limited partnership agreement.

       d.    The PPMs for ACF securities identified the issue of compliance with the Investment Company Act as a material issue. EisnerAmper, and later Deloitte, also identified this material issue. As a result, the auditors required Aequitas to obtain legal opinions confirming Aequitas' compliance with the Investment Company Act. In response to EisnerAmper, by Memorandum dated April 5, 2013, Sidley provided a written opinion and analysis confirming ACF's compliance. Without this legal opinion, EisnerAmper would not have issued a clean audit opinion and Aequitas would not have been able to sell securities.

       e.    Aequitas, Deloitte, and Sidley knew, at the end of 2014, that ACF did not comply with the exemption it had relied upon to avoid registration under the Investment Company Act. SEC rules provide a one-year transition period to regain compliance with the Investment Act of 1940. Sidley advised Aequitas how to regain compliance, and Deloitte relied on this fact in proceeding with its audit engagement. Deloitte also relied on Sidley's repeated assurances with respect to the SEC investigation of Aequitas, an investigation that Sidley disclosed to Deloitte in May 2015.

f. Sidley advised Aequitas how to structure its arrangement with Integrity so as to enable Integrity to act as an aggregator of individual investments in an effort to circumvent the Investment Company Act.

g. Sidley provided legal advice to Aequitas regarding what Aequitas called its "Note Manufacturing Program," including advising Aequitas regarding what constitutes a "security" and advice regarding Investment Company Act compliance. Sidley advised Aequitas that these notes were not securities and that Aequitas was not required to comply with securities laws as to these notes. Based upon Sidley's legal advice, Aequitas did not provide a PPM or other disclosures in connection with its Note Manufacturing Program and was able to sell the subject securities. In fact, the notes are securities.

h. Sidley provided legal services to AIM in connection with AIM's role as an SEC-registered investment advisor and the manager of numerous Aequitas investment vehicles, including ACF; AIPF; AIOF; AIOF-II; ACOF (through its role as manager of ACOFGP); AETC; AEIF; Aequitas Carepayment Fund, LLC; Aequitas Hybrid Fund, LLC; and Aequitas WRFF I, LLC.

i. Sidley provided other legal services to Aequitas, including legal opinions and other legal services that enabled Aequitas to isolate its health care receivable assets from investors and to pledge those assets as collateral securing Aequitas' loan facilities with Bank of America and Wells Fargo Bank, which promoted the illusion of success and legitimacy that Aequitas required in order to perpetuate its ongoing efforts to take money from investors. Among the opinions provided by Sidley was a 2015 opinion to Wells Fargo regarding ACF's status

under the Investment Company Act.

## CLAIM FOR RELIEF

### (Violations of Oregon Securities Law)
### (Against All Defendants)

173.   Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

174.   Securities were sold by Aequitas, as alleged herein, to Plaintiffs in violation of ORS 59.115(1).

175.   As alleged herein, Aequitas sold securities to Plaintiffs in violation of ORS 59.135(2) and 59.115(1)(a), by making untrue statements of material facts and by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Plaintiffs did not know of the untruths or omissions and, in the exercise of reasonable care, could not have known of the untruths or omissions.

176.   As alleged herein, Aequitas sold securities by means of untrue statements of material facts and omission to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of ORS 59.115(1)(b). Plaintiffs did not know of the untruths or omissions.

177.   All Defendants are liable pursuant to ORS 59.115(3) because they participated in and materially aided unlawful sales of securities.

178.    Pursuant to ORS 59.115(2)(a), upon tender of the securities, Defendants are jointly and severally liable for the consideration paid for the

securities, plus interest from the date of payment equal to the greater of the rate of interest provided in the security or 9%, less any amounts Plaintiffs received on the securities.

179.    Pursuant to ORS 59.115(10), Defendants should be required to pay the reasonable attorney fees of Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that:

A.    Plaintiffs be awarded relief pursuant to ORS 59.115(2)(a), including the consideration paid for the securities and interest from the date of payment equal to the greater of the rate of interest provided in the security or 9%;

B.    Plaintiffs and the Class be awarded its reasonable attorney fees pursuant to ORS 59.115(10);

C.    Plaintiffs and the Class be awarded their reasonable costs and expenses incurred in this action, including expert fees;

D.    Judgment be entered in favor of Plaintiffs against Defendants, including interest thereon; and

E.    For such other and further relief as the nature of this case may require or as this Court deems just, equitable, and proper.

## **JURY DEMAND**

Plaintiffs demand trial by jury.

DATED this 30th day of November, 2018.

LEVI & KORSINSKY LLP

/s/ Nicholas Porritt

Nicholas I. Porritt (NP 5291)
55 Broadway, 10th Floor
New York, New York 10006
Tel: (212) 363-7500
Fax: (212) 363-7171